UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM MCDERMET, )<br>)<br>)<br>Plaintiff, )<br>v. )<br>)<br>LIBERTY POWER CORP., LLC, )<br>)<br>Defendant. )<br>) | Case No. 1:18-cv-10043-ADB |

| |
|---|
| )<br>LIBERTY POWER CORP., LLC, )<br>as parent of Liberty Power Holdings, LLC, )<br>)<br>Defendant/Third-Party Plaintiff, )<br>)<br>v. )<br>)<br>MEZZI MARKETING, LLC, )<br>)<br>Third-Party Defendant. ) |

## DECLARATION OF GARY DONALDSON

I, Gary Donaldson, upon my own personal knowledge, under oath hereby depose and state as follows:

1.      I am Senior Manager in Mass Market Telesales at Liberty Power Corp., LLC.

2.      On or about May 5, 2016, Liberty Power Holdings, LLC ("LPHLLC"), a subsidiary of Liberty Power, and Mezzi Marketing, LLC ("Mezzi") entered into a Telesales Channel Agreement (the "Agreement") whereby Mezzi agreed to perform marketing and customer acquisition services by use of telesales activities, with mutual promises, covenants, and

agreements included therein.  A true and accurate copy of the Telesales Channel Agreement is attached hereto, and incorporated herein by reference as Exhibit A.

      3.      On or about January 1, 2017, LPHLLC and Mezzi executed an Amendment to the Agreement.  A copy of the Amendment to the Telesales Channel Agreement is attached hereto, and incorporated herein by reference as Exhibit B.

      4.      At all times relevant hereto, Liberty Power was the known and intended third-party beneficiary of the Agreement and Mezzi knew its actions under the Agreement were intended for the benefit of Liberty Power and LPHLLC.

      5.      By letter dated January 5, 2018, Liberty Power provided prompt written notice of the Complaint to Mezzi and demanded that Mezzi assume sole control of the defense of the same.  Liberty Power further demanded indemnification from Mezzi pursuant to the Agreement.  A true and accurate copy of the January 5, 2018 letter is attached hereto, and incorporated herein by reference as Exhibit C.

      6.      Mezzi acknowledged receipt of Liberty Power's indemnification request by email from Ali Nadeem dated January 25, 2018.

      7.      Should Liberty Power be found liable to Plaintiff in the instant action, which liability Liberty Power expressly denies, such liability will be due to certain telephone calls placed by Mezzi and received by and complained of by Plaintiff in the Complaint.

      8.      Liberty Power did not make any of the telephone calls that are the subject of the Complaint.  All such calls were made by Mezzi and, if any such calls violated any laws, Mezzi took all actions that violated the law.

      9.      Liberty Power relied upon the terms of the Telesales Channel Agreement, including Mezzi's representations and obligations to abide by all applicable laws.  To the extent

that any telephone calls identified in the Complaint violated applicable laws, Liberty Power was neither involved in making such calls nor aware that Mezzi was violating applicable laws.

10.    Liberty Power has incurred and continues to incur defense costs, including attorneys' fees, arising from Plaintiff's claims, for which Mezzi is responsible.

11.    Liberty Power is entitled to complete indemnification from Mezzi for all damages, costs, and expenses that Liberty Power has and will sustain in the instant action, together with interest, costs, and attorneys' fees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June ___1st___, 2018

Gary Donaldson

# **EXHIBIT A**



TELESALES CHANNEL AGREEMENT

This Telesales Channel Agreement, including the attached schedules, Fee/Commission Structure (Schedule 1), Best Practices Guidelines (Schedule 2), Zero Tolerance Policy (Schedule 3), Code of Conduct – Telesales Channel (Schedule 4), Code of Conduct – Telesales Agent (Schedule 5), and Liberty Power Sales Quality Expectations (Schedule 6) (collectively, the "Agreement") is made and entered into by and between Liberty Power Holdings LLC, a Delaware limited liability company, with its principal place of business at 1901 West Cypress Creek Road, Suite 600, Ft. Lauderdale, FL 33309  ("Retailer") and Mezzi Marketing ("Telesales Channel") with its principal place of business at 14519 Cherry Lake Drive East, Jacksonville, FL 32258 (each a "Party" and collectively, the "Parties") as of the 5th day of May, 2016 (the "Effective Date").

WHEREAS, Retailer is properly licensed and/or certified, as applicable, and engages in the business of supplying retail energy services and products to residential and commercial customers in various markets as hereinafter described (the "Applicable Market(s)");

WHEREAS, Telesales Channel represents that it (i) is licensed, registered and/or certified, as may be required by law; and, (ii) possesses the requisite skill, knowledge, and experience to perform marketing and customer acquisition services by use of Telesales activities ("Services");

WHEREAS, Retailer desires to engage Telesales Channel to provide the Services in the Applicable Markets;

WHEREAS, Telesales Channel desires to provide the Services for the benefit of Retailer and any of its affiliates; and

WHEREAS, this Agreement supersedes any Telesales Channel Agreement previously entered into by the parties with respect to all Acquired Customers submitted to Retailer after the Effective Date hereof;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements contained in this Agreement, the Parties hereby agree as follows:

I. DEFINITIONS

1.01 Electricity Product - Electricity Product is defined as delivered electricity sold to retail residential and commercial customers within areas open to retail competition in U.S states or jurisdictions where selection of a competitive retail electric supplier is permitted.  It is understood by both Parties that the Electricity Product consists of the electricity commodity together with services performed by the respective transmission and/or distribution utility ("Utility") and the applicable Independent System Operator ("ISO") but that Retailer does not perform Utility or ISO services and may pass through such charges to the Eligible Customer.

1.02 Eligible Customer - An Eligible Customer is a separately metered residential or commercial customer, or "aggregation" of separately-metered customers, whose meter is located within an area in the Applicable Markets served by Retailer; that is not listed on any state or Federal do-not-call list; that has a bona fide interest in shopping for its electricity supply service; and, that meets Retailer's credit qualification standards. In the case of retail residential and commercial customers not located in the Applicable Market(s), such customer will be qualified by Telesales Channel to be eligible for electric service by a competitive supplier.

1.03 Acquired Customer - Shall mean an Eligible Customer procured by Telesales Channel that is not currently served by Retailer, unless renewal of such Eligible Customer has otherwise been approved or accepted by Retailer, who during the Term of this Agreement (i) signs up for Electricity Product from Retailer pursuant to Retailer's then-current retail sales contract; and (ii) is accepted by Retailer pursuant to Section 2.03. Acceptance shall be indicated by the earlier of the issuance of a contract signed by Retailer or the receipt of a "Welcome Letter" by the Acquired Customer and confirmation sent to Telesales Channel.

1.04 Flow Start Date - Means the day that the Retailer begins to provide electric service to the Acquired Customer as confirmed by the Utility.

II. OBLIGATIONS AND STATUS OF SALES CHANNEL

2.01 Disclosure to Eligible Customers – As may be required by law or Retailer, Telesales Channel shall provide Retailer with a written acknowledgement from each Eligible Customer (e.g. a Letter of Authorization) that specifies that Telesales Channel is authorized to

PROPRIETARY AND CONFIDENTIAL

act as such Eligible Customer's agent, and will assist, to the extent possible, Retailer to obtain information necessary to process the Eligible Customer's application for an Electricity Product, including historical electricity usage and available credit information, authorization for Retailer to disclose Eligible Customer's usage and payment history information to Telesales Channel.   It is understood that while Telesales Channels will provide customer–requested Flow Start Dates, the confirmation of such is provided by the Retailer based on confirmation received from the Utilities. Telesales Channel agrees to provide for review to Retailer any direct mail marketing pieces directly referencing Retailer prior to distribution of any such materials to potential customers.

2.02 <u>Telesales Channel's Representations</u> – Telesales Channel shall not make any false or misleading statements about Retailer, its suppliers, its services or its competitors and, shall at all times comply with the highest ethical standards. Further, Telesales Channel representatives shall not identify themselves as employees of Retailer or of Utility. Telesales Channel warrants and represents that all of its employees, agents, independent salespersons and others hired to market Retailer Services shall conduct themselves courteously, respectfully and in a non-discriminatory fashion at all times when addressing Retailer's customers and potential customers. In the event of any inappropriate actions by such representatives including, but not limited to, any criminal behavior, cursing, rudeness, drinking alcoholic beverages, sexual advances to potential customers, or making false, misleading or defamatory remarks about Retailer, its affiliates, its competitors, any products, or services or other Telesales Channels providing like service, Telesales Channel shall promptly remove such individual from performing any services provided hereunder. In the event such misconduct results in a customer complaint, Telesales Channel shall be responsible and indemnify Retailer for all of the Retailer's losses and expenses.

Telesales Channel agrees to:

i.     faithfully and diligently perform those duties and exercise such powers consistent with them that are from time to time necessary or appropriate in connection with the provision of Services;

ii.     act in accordance with all lawful and reasonable directions of Retailer;

iii.     use its best endeavors to promote the interests of Retailer and its affiliates;

iv.     adhere to highest industry standards and practices, which at a minimum shall include those listed in the attached Best Practices Guidelines; and

v.     not commit Retailer to any legally binding agreement or hold itself out as being able to commit Retailer to any legally binding agreement.

2.03 <u>Prices, Telesales, and Credit Policies</u> – Retailer is solely responsible for the pricing of its Electricity Products, setting discounts if any, and establishing sales and credit policies and such shall be subject to change at Retailer's discretion. Telesales Channel shall not deviate from prices or other terms established by Retailer. All orders and enrollments by Eligible Customers to purchase Retailer Electricity Products are subject to acceptance by Retailer and Retailer may, in its sole discretion, choose to decline or accept a request for service.

2.04 <u>Independent Telesales Channel Status</u> - The Parties to this Agreement are independent contractors. Telesales Channel shall not represent that it is authorized to enter into any agreement on behalf of Retailer. Nothing herein shall create a partnership, joint venture, agency or other association between the parties. Telesales Channel shall be solely responsible for payment of all compensation, taxes and benefits owed to its employees, including payment of employment-related taxes and Workers' Compensation Insurance.

2.05 <u>Receipt of Retailer Funds</u> - Telesales Channel may not take deposits on behalf of or receive any money owed to Retailer. In the event that Telesales Channel receives any monies due or paid to Retailer, Telesales Channel shall hold such funds in trust on behalf of Retailer and shall, as soon as reasonably possible, remit such funds to Retailer at the address provided for notices in this Agreement.

2.06 <u>Compliance with Laws</u> - Telesales Channel represents to Retailer that it is familiar with all laws, ordinances, rules, and regulations governing Telesales solicitation of Services and expressly acknowledges that Retailer relies upon such representation. Retailer and Telesales Channel agree to comply with all local, state, and federal laws and regulations applicable to the transactions between and among Retailer, Telesales Channel and the Eligible Customers and Acquired Customers.

PROPRIETARY AND CONFIDENTIAL

Without limitation, Telesales Channel shall:

i.    if required under applicable law, be licensed or registered as a broker, or aggregator, including Telesales and telephone marketing and sales, and comply with regulatory and legal provisions of the Applicable Markets, as amended from time to time;

ii.   implement any regulatory compliance measures that Retailer deems necessary and that are in accordance with industry best practices, including but not limited to mandatory compliance or other training for its agents and representatives, local and national background checks, drug testing, and such guidelines as may be provided, supplemented, and updated by Retailer from time-to-time;

iii.  promptly notify Retailer and permanently remove any individual who has engaged in fraudulent or deceptive solicitation or who violates any state or federal law or regulation. Such notification shall include the nature of the violation and customers that may be impacted;

iv.   obtain all necessary permits and licenses for itself and for each agent, employee or independent sales person prior to conducting Telesales solicitation on behalf of Retailer.   Telesales Channel is responsible for all related costs, including costs of posting a surety bond; provided, however, Telesales Channel may decline to sell the Services in a given Market if Telesales Channel determines that such costs are unduly burdensome and Retailer agrees; and

v.    be solely liable for and shall indemnify and hold harmless Retailer in respect of any or all fines, penalties or taxes imposed by any governing authority for the failure of Telesales Channel to comply with any local, state or federal law, ordinance, rule or regulation.

2.07 <u>Exclusive Arrangement</u> – Retailer and Telesales Channel agree that this Agreement is exclusive with respect to the sale of Electricity Products for residential customers within the States of Connecticut and Massachusetts ("States").  As such, Telesales Channel agrees to exclusively offer any transaction for the sale of Electricity Products, as specified herein, to Eligible Customers within the States to Retailer for Retailer's approval and acceptance.  Nevertheless, this shall not affect Retailer's ability to enter into business relationships with respect to the identification, marketing and sale of Electricity Products within the State with other channels, consultants, aggregators, brokers, marketers or any other entity.

2.08 <u>Applicable Markets</u> - The Telesales Channel will be authorized by Retailer to sell in the markets as specified in Schedule 1, attached hereto and made a part hereof. Telesales Channel agrees to provide Retailer satisfactory documentation upon request that it has received the appropriate regulatory approvals to sell electric power in the Applicable Markets and will reference any suggested sales guidelines provided by Retailer. Authorization to sell in any additional Markets will be subject to the prior written approval (which may be communicated by electronic mail) of Retailer.

2.09 <u>Assignments and Subcontracting by Telesales Channel</u> - Telesales Channel shall not assign any right or interest under this Agreement (excepting monies due or to become due) or delegate or subcontract any work or other obligation to be performed or owed under this Agreement without the prior written consent of Retailer. Any assignment, delegation or subcontracting without such consent shall be deemed void and Retailer shall be entitled to a refund any monies, fees or commissions paid as a result of such unauthorized work. Any assignment of monies shall be void if (i) Telesales Channel shall not have given Retailer at least 45 days prior written notice of such assignment or (ii) such assignment imposes upon Retailer obligations to the assignee in addition to the payment of such monies, or precludes Retailer from dealing solely and directly with Telesales Channel in all matters pertaining to this Agreement including amendments or settlements of charges. All work performed by Telesales Channel's subcontractor(s) at any tier shall be deemed work performed by Telesales Channel.

2.10 <u>Retailer Audits</u> – At Retailer's discretion Retailer may perform unannounced audit visits to assure office and agent compliance. Retailer further reserves the right to monitor Telesales Channel activities to assure adherence to the approved script and compliance with the Retailer's standards of service and Code of Ethics.  In the event Telesales Channel violates the Code of Ethics and/or standards of service, or is found to deviate from the approved script in a substantial manner that violates any local, state or federal laws or regulations, Retailer may terminate this Agreement immediately without any further liability to Telesales Channel upon written notice to Telesales Channel.

2.11 <u>Deal Capture Entry</u> - Telesales Channel agrees to provide Retailer, on a daily basis according to procedures agreed upon by Telesales Channel and Retailer, the names of any procured customers it has solicited who are interested in purchasing electricity

PROPRIETARY AND CONFIDENTIAL

from Retailer. Telesales Channel shall provide Retailer the following information with respect to such procured customers: the account name, utility name and account number, kWh rate, service address, billing address (if different from service address), and the name of the person authorized to sign a contract on the customer's behalf, and any other customer information that is requested by Retailer.

Telesales Channel will submit customer information to Retailer through the Deal Capture System pursuant to Retailer's instructions. All accounts procured each day must be entered into Deal Capture System by 11:59 pm in order to qualify for Retailer's daily issued price.

## III. COMMISSIONS AND EXPENSES

3.01 <u>Commissions</u> - For each Acquired Customer procured as a direct result of Telesales Channel's efforts, Retailer agrees to pay Telesales Channel the applicable commission as set forth in the attached Schedule 1, or such other form as mutually agreed upon by the Parties.

3.02 <u>Commission Reimbursement (Charge-backs)</u> - Telesales Channel agrees to repay Retailer in accordance with Schedule 1, or such other form as mutually agreed upon by the Parties, for commissions paid by Retailer for each Acquired Customer that terminates service with Retailer before the end of the Acquired or renewed Customer contract term or otherwise breaches the customer contract (including failure to pay an outstanding balance). Telesales Channel also agrees to repay Retailer any commissions paid for customers subsequently determined to have been not properly acquired by Telesales Channel or which acquisition contravened the terms of this agreement, legal or regulatory standards.

3.03 <u>Expenses</u> - Neither Party shall be liable to the other Party for any business or other expenses incurred by it in connection with the performance of this Agreement.

## IV. CONFIDENTIALITY.

4.01 <u>Confidential Information</u> - The Parties acknowledge that each of them from time to time will receive "Confidential Information" (as defined below) of the other Party (in such capacity referred to herein as the "Receiving Party"). Each Party agrees that it will not use except in connection with the transactions contemplated pursuant to this Agreement or disclose to any person Confidential information of the other Party hereto (the "Disclosing Party") except as otherwise authorized in this Agreement or required by applicable law or regulation. "Confidential Information" shall mean any information relating to or disclosed in the course of the performance of this Agreement, which is or should be reasonably understood to be confidential or proprietary to the Disclosing Party, including, but not limited to, the pricing terms of this Agreement, Customer Information (as defined below), technical processes, product designs, sales, cost and other unpublished financial information, product and business plans, projections, and marketing data. "Customer Information" is any information, regardless of form, that is associated with any identifiable Retailer and/or Telesales Channel customer or potential customer that the Receiving Party obtains pursuant this Agreement. Telesales Channel further agrees to destroy and not to review, use for any purpose, or disclose to any third party any Confidential Information of Retailer that Telesales Channel may receive in error or otherwise which may come into the possession of Telesales Channel without Retailer's express written permission.

4.02 <u>Exclusions</u> - Confidential Information shall not include, and the Receiving Party shall not be liable for disclosure of, any information obtained by the Receiving Party under this Agreement if the information: (i) is generally available to or known to the public through no wrongful act of the Receiving Party; (ii) was previously known by the Receiving Party through no wrongful act of the Receiving Party; (iii) was independently developed by the Receiving Party; or (iv) was disclosed to the Receiving Party by a third party, including Eligible Customers or Acquired Customers, under no obligation of confidentiality to the Disclosing Party. Notwithstanding anything to the contrary, Retailer's use or disclosure of information regarding an Eligible Customer that becomes an Acquired Customer shall not be limited by this Agreement.

4.03 <u>Non-Compete</u> - During the term of this Agreement, Telesales Channel shall not, directly or indirectly, either as a contractor, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of Retailer.

4.04 <u>Non-Solicitation</u> - Retailer agrees that, without written consent from the Telesales Channel, it shall not enter into a separate relationship for the referral of retail customers with any of the Telesales Channel's team members, to include employees designated as a team lead, manager, campaign manager, or manager-owner, outside of this Agreement for a period of twelve (12) months following the date that the employee ceases to be employed by Telesales Channel. In return Telesales Channel agrees not to pursue for hire any of Retailer's employees during the term of their employment with Retailer and for twelve (12) months following the

PROPRIETARY AND CONFIDENTIAL

termination of their employment.  In the event that either company violates the commitments made above, upon notice from the other party, such notified party shall have thirty (30) days to correct such violation

## V. INDEMNITY/LIMITATION OF LIABILITY

5.01 <u>Indemnity</u> - Each Party agrees to defend, indemnify and hold the other Party harmless against all claims, damages, and liability (including reasonable attorney's fees) resulting from or arising out of the indemnifying Party's breach of this Agreement, non-compliance with any applicable law or regulation, other failure to perform its obligations under this Agreement, negligence, misconduct, or any material inaccuracy of any representation or warranty by that Party set forth in this Agreement; provided, however, that such indemnity shall be conditioned upon the Party seeking indemnification giving the other Party prompt written notice of any claim and sole control of the defense of such claim. The obligations set forth in this Paragraph shall survive the expiration or any termination of this Agreement, with respect to any such claim, damage or liability, until the statute of limitations applicable to such matter has expired.

5.02 <u>Limitation of Liability</u> - RETAILER'S LIABILITY HEREUNDER IS LIMITED TO DIRECT ACTUAL DAMAGES AS THE SOLE AND EXCLUSIVE REMEDY, AND TOTAL DAMAGES SHALL NOT EXCEED THE LESSER OF (i) THE TOTAL AMOUNT PAID TO SALES CHANNEL UNDER THIS AGREEMENT DURING THE ONE YEAR PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM(S) OR (ii) $100,000. RETAILER WILL NOT BE LIABLE HEREUNDER FOR SPECIAL, CONSEQUENTIAL, INCIDENTAL, EXEMPLARY OR PUNITIVE DAMAGES, REGARDLESS OF WHETHER THOSE DAMAGES ARE CLAIMED UNDER CONTRACT, WARRANTY, INDEMNITY, TORT OR ANY OTHER THEORY, AT LAW OR IN EQUITY.

## VI. TERM

6.01 <u>Initial Term, Auto-Renewal</u> - The Term of this Agreement shall commence on the Effective Date, and, unless terminated earlier as provided in this Article VI, will continue for one (1) year ("Initial Term"). At the end of the Initial Term, and on each one-year anniversary thereafter, the Agreement will renew automatically for one year unless one of the Parties gives at least thirty (30) days prior written notice of its election not to renew this Agreement.

6.02 <u>Termination</u> - Either Party may terminate this Agreement upon thirty (30) days prior written notice; provided, however, that in the event that Retailer terminates this Agreement or Telesales Channel terminates this Agreement as a result of a material change made by Retailer pursuant to Section 7.05, Telesales Channel shall be entitled to any fees as they are owed for Acquired Customers represented by Telesales Channel and currently under contract with Retailer prior to the termination of this Agreement, subject to any Reimbursement or setoff owing to Retailer hereunder.

Retailer at all times reserves the right to suspend Telesales Channel access to Retailer information technology systems, which may include not accepting or rejecting submitted sales transactions.  Any fees or commissions due and payable prior to suspension by Retailer shall resume through the term of any such suspension unless the suspension resulted from Telesales Channel actions or inaction that contravened the terms of this agreement, legal or regulatory standards.

## VII. GENERAL AND ADMINISTRATIVE PROVISIONS

7.01 <u>Notices</u> - Any notice provided for hereunder shall be in writing and shall be delivered in person, or sent by United States mail, postage prepaid, certified, return receipt requested and addressed to the intended recipient at the address set forth below, or by confirmed facsimile at the number indicated below.

<u>Telesales Channel</u>: Mezzi Marketing
Attn: Ali Nadeem
Phone: 908-340-7977 or 800-876-8240
Fax:
Email: info@transdataworks.com

<u>Retailer</u>: Liberty Power Holdings LLC
Attn: Alberto Daire
1901 West Cypress Creek Rd., Suite 600
Ft. Lauderdale, FL 33309
Telephone: 954 598-7003
Fax: 954 771-6644
Email: <u>alberto.daire@libertypowercorp.com</u>

PROPRIETARY AND CONFIDENTIAL

With a copy to: Liberty Power Holdings LLC
Attn: General Counsel
1901 West Cypress Creek Rd., Suite 600
Ft. Lauderdale, FL 33309
Telephone: 954-598-7061
Fax: 954-771-6644
Email: generalcounsel@libertypowercorp.com

7.02 <u>Assignment; Parties Bound</u> - Neither this Agreement nor any interest under it shall be assignable by Telesales Channel or Retailer, by operation of law or otherwise, without the prior written consent of the other Party. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns.  Retailer, however, shall have the right to freely assign this Agreement to any of its affiliates or successors.

7.03 <u>No Waiver</u> - The failure or delay in the enforcement of the rights detailed in this Agreement by either Party shall not constitute a waiver of its rights under this Agreement or be considered as a basis for estoppel. Either Party may exercise its rights under this Agreement despite a delay or failure to enforce those rights.

7.04 <u>Dispute Resolution</u> - In the event of a disagreement or a dispute arises between the Parties in connection with this Agreement, both Parties hereby agree to binding arbitration to take place in Fort Lauderdale, Florida, or such other location as the Parties shall agree to, before filing a legal complaint or cause of action in a court of law.  The arbitration shall be conducted in accordance with the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association (the "AAA") as in effect on the date of this Agreement.   Notwithstanding anything contrary contained herein, and regardless of any procedures or rules of the AAA, it is expressly agreed that the following shall apply and control over any other provision in this Section 7.04:

    i.     The Parties may, by written agreement signed by both Parties, alter any time deadline, location(s) for meeting(s), or procedure outlined in this Section 7.04 or in the AAA rules.

    ii.    Time is of the essence for purposes of the provision of this Section 7.04.

    iii.   Either Party may seek a restraining order, temporary injunction, or other provisional judicial relief if the Party in its sole judgment believes that such action is necessary to avoid irreparable injury or to preserve the status quo.  The Parties will continue to participate in good faith in the procedures despite any request for provisional relief.

    iv.   Except to the extent that either party is found liable for fraud, gross negligence or willful misconduct, each Party shall divide equally the cost of the arbitrator and the hearing and each Party shall be responsible for its own expenses and those of its counsel and representatives. In the event that a party is found liable for fraud, gross negligence or willful misconduct, the arbitrator may include the other party's legal fees and costs in any award.

7.05 <u>Governing Law; Entire Agreement; Material Change; Severability</u> - This Agreement shall be governed by the laws of the State of Florida.   This Agreement shall represent the entire agreement by and between the Parties except as otherwise provided in this Agreement. The Agreement may not be changed except by written amendment duly executed by the Parties, except that Retailer may change any provision of this Agreement by providing thirty (30) days prior written notice to Telesales Channel. In the event that Retailer provides a notice of any material change to the Agreement, Telesales Channel may terminate this Agreement pursuant to Section 6.02 hereof.

PROPRIETARY AND CONFIDENTIAL

IN WITNESS WHEREOF, the Parties have caused this Telesales Channel Agreement to be executed by their duly authorized representatives as of the Effective Date.

LIBERTY POWER HOLDINGS LLC                    MEZZI MARKETING, LLC

(Retailer)                                    (Telesales Channel)

By:_____                    By: MEZZI MARKETING, LL
Print Name:_____                    Print Name: ALI-NADEEM
Print Title:_____                    Print Title:_____
Date:_____                     Date: 06-09-2016

**SCHEDULE 1**
**Residential Compensation Structure**

This Residential Compensation Structure is effective from May 5, 2016 through and including December 31, 2016.

**1. Commission Basis**

(a)   **Daily Residential Pricing Commission** - For each residential Acquired Customer ("Acquired Customer") procured as a direct result of Telesales Channel's efforts and based upon Retailer's Daily Residential Pricing, Retailer agrees to pay Telesales Channel a flat commission of sixty dollars ($60.00) per residential customer contract where the Acquired Customer contract term is twenty-four (24) months or greater**.**  No commission shall be paid where the Acquired Customer contract term is less than twenty-four (24) months unless agreed to in writing by Retailer.

**2. Calculation Basis and Timing of Payment**

(a)   **Payment of Commissions for Daily Residential Transactions** - For each Acquired Customer contract procured as a direct result of Telesales Channel's efforts based on Retailer's Daily Pricing, Telesales Channel will be paid one lump sum as follows:

  I.   For new Acquired Customer contracts with a Flow Start Date within sixty (60) days of the acceptance of Acquired Customer's enrollment request, Telesales Channel will receive the lump sum commission payment for the contract term within fifteen (15) business days following the date that an Acquired Customer is accepted by Retailer.

 II.   For new Acquired Customer with a Flow Start Date sixty (60) or greater days from the Acquired Customer acceptance, Telesales Channel will receive the commission payment within fifteen (15) business days of an Acquired Customer actually flowing as per meter read as confirmed by the utility.

III.   In the event that the customer contract is for a renewed Acquired Customer, Telesales Channel will receive the commission payment within fifteen (15) business days of an Acquired Customer actually flowing as per meter read as confirmed by the utility.

(b)   **Renewal and Timing of Renewed Acquired and Other Customer (aka "Residual") Payment**

  I.   Telesales Channel shall not contact Acquired Customers without express prior written authorization by Retailer;

 II.   At Retailer's discretion, Retailer may contact Acquired Customers and renew Acquired Customer's contracts independently of Telesales Channel, without any obligation to pay a renewal commission;

III.   At Retailer's discretion, Telesales Channel may be provided with information and schedules of existing Retailer customer contracts ("Other Customers") and/or Acquired Customers for purposes of renewal with Retailer by Telesales Channel; and,

IV.   Payment of Commissions for renewed Daily Pricing Transactions – For each Acquired or Other Customer renewed, with contract renewal terms of twenty-four (24) months or greater, as a direct result of Telesales Channel's efforts based on Retailer's Daily Pricing, Telesales Channel will be paid pursuant to Sections 1(a) and 2(a)III of this Schedule.

**3. Commission Adjustments**

(a)   **Early Customer Termination** - In the event that an Acquired Customer terminates service with Retailer or otherwise breaches its contract with Retailer during either the initial thirty (30) days immediately following the Acquired Customer's Flow Start Date with Retailer or within thirty (30) days of renewal ("Customer Default"), Retailer shall be entitled hereunder to obtain a Refund from Telesales Channel for any commissions advanced.

(b)   **Commission Reimbursement (Charge-backs) -** In the event that Telesales Channel owes Retailer a Refund pursuant to this Agreement, the Refund shall be paid to Retailer within the earlier of thirty (30) days from the date of such Customer Default, or as set offs by Retailer against commission payments due to Telesales Channel after Customer Default.   In the event no further commission payments are due hereunder, Telesales Channel will pay Retailer the Refund amount within five (5) business days'

PROPRIETARY AND CONFIDENTIAL

notice thereof. The obligation of Telesales Channel to pay a Refund to Retailer shall survive any termination of this Agreement whether by its terms, or through any termination by Telesales Channel or Retailer, as the case may be.

(c) **Commission Payment Challenge by Telesales Channel**

    I.   Telesales Channel agrees to identify any commission payment (or omission of payment) discrepancies via email within the lesser of sixty (60) calendar days after the disputed commission payment was issued, or sixty (60) calendar days after the disputed commission payment was due, and Retailer agrees to reconcile the disputed payment within thirty (30) calendar days after notification of any alleged discrepancy, so that any agreed upon adjustment based upon a Telesales Channel challenge is made within fifteen (15) calendar days of an agreed upon resolution of the claimed discrepancy.

    II.   Retailer and Telesales Channel therefore agree that Retailer has no obligation to reconcile or honor any commission dispute that is identified more than sixty (60) calendar days after the date the disputed or omitted payment was made or was due.

(d) **Termination of Commission Payments** - Payment of any and all commission(s) pursuant to the Agreement shall terminate upon the earlier of:

    I.   Retailer's payment of all commission payments for (i) each lump sum billing owed to Telesales Channel and corresponding to the initial term of service of an Acquired Customer pursuant to its contract with Retailer, and (ii) any lump sum billing owed to Telesales Channel and corresponding to any renewal term entered into pursuant to a new contract with Retailer, or amendment of the prior contract with Retailer, which in each case an Acquired or Other Customer enters into directly as a result of the efforts of Telesales Channel (excluding any monthly billing cycles pursuant to any automatic renewal provisions set forth in the contract with Retailer);

    II.   The Acquired or Other Customer's Termination of Service, subject to the provisions of this Schedule; or

    III.   Retailer's termination of this Agreement for Telesales Channel's breach of its obligations hereunder, provided, however, that in the event that Retailer terminates this Agreement, Telesales Channel shall be entitled to any commissions as they are owed for Acquired or Other Customers procured by Telesales Channel and under contract with Retailer prior to the termination of this Agreement (but excluding any obligation of Retailer to pay Telesales Channel any commissions pertaining to an Acquired or Other Customer's renewal term which term commences subsequent to the termination of this Agreement).

## 4. Upfront (aka "True-up") Payment Reconciliation:

(a) Other Commission Structures – In the event any amounts are owing to Retailer, same will be charged back against Telesales Channel's account within fifteen (15) business days of any reconciliation or an invoice will be sent to Telesales Channel to be paid within such period, at Retailer's option.  In the event any commissions are owing to Telesales Channel, Retailer will pay such commissions within fifteen (15) business days.

## 5. Applicable Markets

(a) The Applicable Markets are Connecticut and Massachusetts.  Other Applicable Market may be added as mutually agreed upon by Retailer and Telesales Channel.

## 6. Key Performance Indicators

(a) Telesales Channel must meet and maintain all Key Performance Indicators ("KPIs") outlined herein throughout the term of the Schedule. Retailer and Telesales Channel agree to conduct monthly reviews to ensure that KPIs are maintained.  If it is determined by Retailer that Telesales Channel is not meeting any of these KPIs, Retailer may, in its sole discretion, exercise its right to revise or terminate this Schedule.

    I.   Telesales Channel's efforts must result in a minimum of 75 Acquired Customer contracts procured on behalf of Retailer each week.

    II.   Telesales Channel must have at least fifteen (15) full-time agents engaged on the campaign at all times during the first 60 days of the campaign.  Thereafter, the number of full-time agents engaged on the campaign will be increased by Telesales Channel.

III.    Telesales Channel must achieve an overall minimum average quality assurance score of eighty-five percent (85%) per week.

IV.    Telesales Channel shall achieve an overall retention rate of eighty-five percent (85%) per month.

**SCHEDULE 2**
**Best Practices Guidelines.**

Telesales Channel shall, for each office location and sales agent, as applicable:

    i.  Have daily morning sales meetings/calls;

    ii.  Conduct formal interviewing and screening of field agent candidates, including but not limited to local and national background checks, drug testing, reference checks, etc.;

    iii.  Maintain and provide Retailer with weekly, or upon request, updated field agent rosters, that include by Agent:

        b. picture and badge number;
        c. employment start and termination date, telephone number , current position;
        d. markets, active and past sales;
        e. supervisor;
        f. trainer;
        g. trainees;
        h. complaint history.

    i.  Accurately document training history, including issuance of temporary and permanent badges upon completion of training;

    ii.  Maintain full-time compliance manager or officer;

    iii.  Have mandatory and periodic regulatory compliance and sales training, provide attendance roster upon Retailer's request;

    iv.  Conduct in-depth and timely investigation of all complaints (internal or regulatory) and provide detailed results and action taken to Retailer within 2 business days of receipt of notification of complaint;

    v.  Provide Retailer with full disclosure of ownership, management, financial or other interests in DTD Channel or its business operations;

    vi.  Adhere to Retailer's Zero Tolerance Policy – attached herein.

**TELESALES CHANNEL AGREES TO PROVIDE UNRESTRICTED ACCESS TO ANY OF THE PROCESSES, DOCUMENTS, MEETINGS OR INDIVDUALS (MANAGERS, AGENTS, REPRESENTATIVES, ETC.) DESCRIBED IN THIS AGREEMENT AND AS PART OF THEIR OPERATIONS FOR PURPOSES OF ASSURING COMPLIANCE POLICIES ARE IN PLACE AND ARE BEING FOLLOWED AND ENFORCED.**

Telesales Channel Initials: _____

PROPRIETARY AND CONFIDENTIAL

## SCHEDULE 3
### Zero Tolerance Policy.

Liberty Power Holdings, LLC ("Retailer") requires aggregators, brokers, consultants, telemarketers and Telesales channels (individually and collectively referred to as "Sales Channel", including their direct employees or subcontractors (individually and collectively referred to as "Sales Representative") soliciting the sale of or selling Retailer products to comply with our Code of Conduct, and to be in full compliance with all local, state and federal consumer protection laws and regulations, including deceptive and unfair business practices laws.

In the event that Retailer receives a complaint from a customer or prospective customer or notice of a complaint filed against Retailer with any local, state or federal governmental or regulatory body in connection with any Sales Channel and/or Sales Representative solicitation of or sale of any Retailer product, Retailer within twenty-four (24) hours will commence an investigation of said complaint. At this time, Retailer, in its sole discretion and to the extent contractually and lawfully permissible, singularly or in combination thereof, will:

- Direct the Sales Channel, where one of its employees or subcontractors is involved, to suspend such Sales Representative from conducting a specific sales activity or any and all sales activity on behalf of Retailer pending completion of its investigation of the complaint
- Suspend the Sales Channel from conducting a specific sales activity or any and all sales activity on behalf of Retailer pending completion of its investigation of the complaint
- Freeze all pending commissions directly related to the complaint payable to Sales Channel and/or a Sales Representative pending completion of its investigation of the complaint
- Review in detail, all contracts closed or customers contacted by Sales Channel and/or Sales Representative within the past sixty (60) days
- Require full participation and cooperation from the Sales Channel and/or Sales Representative in its investigation, and to provide within two (2) business days from notification:

  - The complete set of customer contact calls including, but not limited to initial contact, sale, and Welcome Call recordings (where applicable) and any written information or documentation relating to the complaint
  - A written statement from the Sales Channel and/or Sales Representative setting forth its position on the complaint
  - All information relating to the tenure and training certification of Sales Representative(s)Sales Representative related to the complaint, and
  - Any other information deemed relevant by Retailer to the complaint.

If the investigation reveals that the Sales Channel and/or Sales Representative violated our Code of the Conduct through (i) forgery (ii) misrepresentation of supplier relationship or (iii) product misrepresentation, including but not limited to (1) false claims of savings (2) aggressive sales tactics, (3) any other activity which may mislead the customer in an attempt to complete a contract, or (4) constitutes or reasonably will be found to constitute a violation of any local, state or federal consumer protection law(s) or regulation(s), including deceptive or unfair business practices laws, Retailer may take the following actions, to the extent contractually and lawfully permissible, singularly or in combination thereof, including, but not limited to:

- Terminate Retailer's Agreement with Sales Channel
- Require Sales Channel to provide documentation and/or certification of training undertaken to ensure that the conduct on its part and/or its Sales Representative which gave rise to the complaint will not occur again
- Direct Sales Channel to permanently suspend Sales Representative from further participation in a specific Retailer sales campaign or activity or any and sales activity on behalf of Retailer
- Submit the Sales Representative's name to the Retailer Black List
- Chargeback all pending or paid commissions to the Sales Channel and/or Sales Representative directly related to the complaint
- Require the Sales Channel and/or Sales Representative to fully reimburse Retailer for any fines imposed upon it by any governmental or regulatory body resulting from the complaint as well as all reasonable costs and expense, including attorney's fees, incurred by Retailer in conjunction with its defense of or response to the complaint

By signing this document, I confirm that I have read and understood the Retailer Code of Conduct and Retailer's Zero Tolerance Policy. I also agree to comply with, and understand the consequences of non-compliance with same.

Telesales Channel Initials: _____

PROPRIETARY AND CONFIDENTIAL

**SCHEDULE 4**
**Code of Conduct - Telesales Channel.**

Liberty Power Holdings LLC ("Retailer") is strongly committed to maintaining its reputation for integrity in all aspects of our business operations including all relations with our customers, prospects, regulatory bodies, utility representatives, brokers, aggregators, and sales and marketing channels. As a channel to Retailer, I **HU_NADEEM** on behalf of **MEZZI MARKE** commit to uphold the values and reputation of Retailer as a condition of our channel relationship.

**MEZZI MARKETING, LLC** is committed to executing our business activities on behalf of Retailer in a manner consistent with Retailer's values and Code of Ethics as outlined below:

Commitment to meet contractual obligations. Agents will complete certified training programs as defined by Retailer prior to engaging in any sales activities on behalf of Retailer. The predetermined number of resources will be made available on the specified dates to begin the training and subsequent sales programs. A monitoring and controls system will be used to monitor the activities of all sales agents, and will include written policies describing violations, punishment, and remedies. We will make these policies available upon request.

Retailer Required Approvals. Sales activities will be limited to those geographic, demographic, volumetric and other criteria of the prospective customer targets as defined by Retailer. Unless otherwise directed in writing by Retailer, we shall solicit only to prospective customers listed in the lead lists or that otherwise match the Prospective Customer criteria furnished by Retailer. Retailer will provide us with applicable price, product, terms, product benefits, and other marketing information (collectively the "Marketing Information"). We understand that Retailer may change, modify, eliminate or supplement the Marketing Information from time to time, at its sole discretion, and that it is our responsibility to implement changes to the Marketing Information within specified time frames. We acknowledge that Retailer may, and must provide prior written approval before we may distribute, communicate or otherwise make use of any other texts, marketing information, training materials, sales pitches or representations.

Verification and Quality Assurance. We will abide by the provisions of the Retailer Quality Assurance program as described by the Retailer Channel Manager and provide information and make resources available for regular meetings as requested by Retailer with regard to Quality Assurance activities. If requested, we will communicate any applicable sales information conducted through an independent verification company selected and approved by Retailer, for the performance of quality control and/or verification call backs on sales.

Confidential Information. We will abide by all terms and conditions of the confidentiality provisions of the Channel Agreement.

Requests for Information. We acknowledge the importance of responding to all requests for information in a timely manner. We agree to respond to all requests from a Retailer representative within 24 hours. We also agree to cooperate with Retailer in response to all investigations, complaints, or other actions any regulatory or enforcement agency.

Employee Screening. We agree to cooperate with Retailer in obtaining background checks on all employees and agents as defined by Retailer. As part of its own Sales Channel Quality Assurance activities, Retailer may, at its discretion, direct us regarding the minimum hiring, training and retention standards for Channel employees, contractors, agents and assigns that will be used in the sales and representation of Retailer products.

Campaigns. At any time, Retailer shall have the right to immediately suspend in all or in part, any marketing program, campaign or efforts for any reason and we, the Channel, our employees, agents, contractors and assigns shall immediately cease all related activities.

Employee Information. We agree to provide Retailer with up to date employee rosters no less than monthly or as requested. Should there be a change in the information previously provided to Retailer, we agree to inform Retailer of change within 24 hours.

       PROPRIETARY AND CONFIDENTIAL

Do Not Contact Information. We acknowledge the importance of respecting a customer's request to not be contacted by Retailer and will report such requests to Retailer weekly, or as requested, and remove the customer's contact information immediately from all campaigns.

Legal Compliance and Good Standing. We represent and warrant that we will at all times comply with all laws, rules, tariffs and regulations of all applicable Federal, state and local authorities and utilities. We represent and warrant that we are duly existing and in good standing in our state of formation and qualified and licensed to do business in, and in good standing in, any state in which the conduct of our business or our ownership of property requires that we be qualified.

Scripting. We agree to provide all employees with Retailer approved scripts, to train all employees on the use of the scripts, and ensure compliance with the scripts through monitoring and oversight. All revisions to Retailer scripts must be approved by Retailer prior to implementation.

Notifications. We agree to notify Retailer of any violation, involvement of law enforcement, or any other incident which may jeopardize Retailer's reputation, license, or ability to do business as quickly as the circumstances allow but no later than 24 hours after the event is identified.

## Additional Commitments from Channel

We will supply employee or contracted labor that is capable of selling electricity or related products.

We will ensure that all employees identify themselves appropriately, dress professionally, and wear their Retailer ID Badge and lanyard when selling on behalf of Retailer when conducting Telesales.

We will ensure that employees represent themselves accurately as selling on behalf of Retailer, and do not state, imply, or knowingly allow the prospective customer to believe that they are a representative of the local utility, another retail electric provider, or any other governing body.

We will ensure that employees do not imply in any way that a customer will receive any guaranteed savings or gifts that are not part of the product or active promotion.

We will ensure that agents obtain authorization from the responsible party prior to contracting with a customer.

We will require that all employees act professionally, and will not tolerate an agent who places undue pressure on a prospective customer, or uses aggressive sales tactics, in order to enroll them.

We will not allow employees to conduct sales activities in languages which are not approved by Retailer, or use family members or minors as translators.

We will prohibit employees from marketing to individuals who do not demonstrate a clear understanding of the program offering, such as minors or disabled or impaired individuals.

We will take steps to ensure that employees or contracted labor are not under the influence of drugs or alcohol while performing the tasks required of them, or while wearing Retailer logo attire.

We will ensure that employees or contracted labor do not engage in fraudulent, unfair, misleading, deceptive, activities in marketing Retailer products.

We will ensure that each employee or contracted labor reads and signs an Agent Code of Conduct, which will be provided to Retailer prior to agent's engagement on the Retailer campaign. .

We will review enrollment forms to ensure that they are complete and match criteria established by Retailer.

MEZZI-MARKETING LLC acknowledges the importance of the requirements documented in Retailer's Code of Ethics, and agrees to comply with all provisions as a part of its Channel status with Retailer.

Telesales Channel Initials: _____

Telesales Channel Agreement

PROPRIETARY AND CONFIDENTIAL

14 | P a g e

**SCHEDULE 5**
**Code of Conduct – Telesales Agent.**

While I am representing Liberty Power Holdings LLC ("Retailer"), I understand that I must comply with certain expectations for behavior. These include the following:

1. I will truthfully identify myself to the prospective customer stating first and last name and that I represent Retailer.

2. I will not market Retailer products without wearing appropriate Retailer ID badge and lanyard.

3. I will not state, imply, or knowingly allow the prospective customer to believe that I am a representative of the local utility, another retail electric provider, or any other governing body.

4. I will make no representations or statements that the prospective customer must switch their supplier in order to continue receiving power.

5. I will only use an approved Retailer sales script when talking to prospective customers and will not imply in any way that a customer will receive benefits, service, savings or gifts that are not part of the product or an active promotion.

6. I will not attempt to enroll any commercial or residential customer unless I have confirmed that the person I am speaking with is authorized to make a decision regarding the utility account (account holder, legal spouse, or corporate representative).Further I will not attempt to enroll an individual who does not demonstrate a clear understanding of the program offered, an individual who is not able to understand the consequences of their actions , or to an individual who is not legally capable of signing a binding contract (such as an impaired person or minor.

7. I will not place undue pressure on a prospective customer, or use aggressive sales tactics in order to enroll them.

8. I will not solicit to customers in buildings which display signs regarding No Soliciting, Trespassing, or Peddling. Should a customer request that I leave their property, I will leave promptly without engaging in further conversation.

9. I will only sell to customers in the language for which I have Retailer documentation (i.e. contract, terms and conditions, etc.) and will not engage minors or other family members to act as an interpreter.

10. I will not "slam" a prospective customer, which is the act of causing their electricity service to be switched without their consent.

11. I understand that I must treat all prospective customers with respect and maintain an appropriate degree of professionalism as established by the Sales Channel and Retailer.

12. I understand that use of, or being under the influence of drugs or alcohol while representing Retailer will result in immediate suspension or termination.

13. I agree to comply with all applicable regulatory guidelines (PUC/PSC/ICC) specific to the sale of retail electricity and the marketing method utilized.

14. I will provide Retailer's contact information at the time of each sale and when requested.

15. I will not disclose Retailer proprietary or customer information to an unapproved Third Party.

**Telesales Agent Initials:**

**SCHEDULE 6**
**Liberty Power Sales Quality Expectations – Telesales Channel**

This Policy is effective as of May 1, 2014, and only applies to regulatory complaints and contracts received after that date.  Any regulatory complaints or Quality Assurance scores related to incidents occurring after May 1 will be subject to the specific consequences pursuant to this Policy.

Nevertheless, nothing stated herein shall limit or otherwise impede Liberty Power's ability to enforce its contractual and legal rights or assert contractual or legal liability with respect to covered Sales Channels at any time, and for any occurrence, whether prior to, or subsequent to, the effective date of this Policy.

**Channel Best Practices:**

Sales Channels are expected to maintain a sales complaint percentage of 0.1% (1 in 1000 submitted deals) in any given market. A complaint is defined as any customer dispute received from an external authority, rather than through the internal customer care hotline.

**Channel Incentives:**

**Description:**
Liberty Power believes in rewarding Channels for being active and responsible vendors in the market and will reward such responsible Channels in the following manner:

For markets which allow the use of the PowerPad:

| Contracts Received per Month | Quality Assurance Incentive | Zero Complaint Incentive |
| --- | --- | --- |
| 300-499 | Channels will receive a $500 bonus for each full calendar month where monitoring scores average 85% or greater.* | Channels will receive a $500 bonus for each full calendar month in which the Channel receives no sales complaints. |
| 500-1000 | Channels will receive a $1,000 bonus for each full calendar month where monitoring scores average 85% or greater.* | Channels will receive a $1,000 bonus for each full calendar month in which the Channel receives no sales complaints. |
| 2000+ | Channels may also earn an extra $500 for each additional 1000 contracts submitted during the same calendar month while maintaining the monitoring scores above. | N/A |

*Liberty Power must monitor at least 8 sales per agent per month

For markets in which the PowerPad cannot be used:

| Contracts Received per Month | Zero Complaint Incentive |
| --- | --- |
| 300-499 | Channels will receive a $1000 bonus for each full calendar month in which the Channel receives no sales complaints. |

PROPRIETARY AND CONFIDENTIAL

| 500-1000 | Channels will receive a $2,000 bonus for each full calendar month in which the Channel receives no sales complaints. |
| 2000+ | Channels may also earn an extra $500 for each additional 1000 contracts submitted during the same calendar month in which the Channel receives no sales complaints. |

**Payment Schedule:**

Rewards will be payable on a monthly basis within thirty (30) days of after the reporting month.  Rewards will be payable on commission reports through the current commission payment method.  The Quality Assurance Incentive will only be payable if Channel maintains a complaint ratio of 0.001, or 0.1%.  In order to remain eligible for the incentive, telesales channels must ensure that Liberty Power has access to all recordings of calls made on its campaign.

<u>**Channel Complaint Fines:**</u>

**Description:**
Should a Sales Channel exceed the expected sales complaint ratio of 0.1% in any month based on a rolling 12 month basis, the following fines will be assessed:

- $1,000 for each regulatory complaint received as a result of improper sales practice that cannot be disputed by Liberty Power, or with respect to regulatory complaints for which there is insufficient information to make a determination.
- $2,000 for each regulatory complaint received as a result of customer slamming or forgery that cannot be disputed by Liberty Power, or with respect to regulatory complaints for which there is insufficient information to make a determination.

<u>**Assessment Schedule:**</u>
Fines will be assessed on a monthly basis, and deducted from the Channel's commissions no less than thirty (30) days after the reporting month.

<u>**Incentives Participation:**</u>

Channels are required to maintain a sales to sales-related complaint ratio below 1.5% (15 complaints per 1000 contracts submitted). This ratio will be based on a rolling twelve month average. Should a channel's ratio exceed 1.5%, the channel will be reviewed by the Liberty Power Channel Review Board, as soon as reasonably feasible, and the Board will make a determination regarding whether the Channel will be allowed to continue selling, and under what circumstances.

<u>**Liberty Power Rights and Responsibilities**</u>

- Liberty Power will perform its due diligence to research each complaint and assign an accurate resolution status to each complaint.
o The Legal Department will work with the following individuals to reach a consensus on the disposition for each complaint:
    - Senior Manager, Channel Development Manager
    - Sales Development Manager
    - Manager, Compliance
o If a consensus cannot be reached, the General Counsel will make the final decision.
o In order to be eligible for an incentive, the sale must be a clean sale that Liberty Power can stand behind.
- Liberty Power reserves the right, in its sole discretion, to take other action against a non-compliant Sales Channel, including suspension or termination.
- Fines may be waived or reduced by a Sales Channel terminating an agent before a directive from Liberty Power to do so. Such discretion to waive or reduce a fine on the basis shall reside in the Sales Channel Manager, as approved by the Manager, Compliance.
- Liberty Power reserves the right to direct that a Sales Channel representative be removed from the Liberty Power campaign at any time, and for any reason.

PROPRIETARY AND CONFIDENTIAL

- Liberty Power has right to revise this Policy at any time with an immediate effective date.
- This document will be interpreted in Liberty Power's sole discretion.

ALI-NADEEM.

I, _____, the __Director Oferions__ of __MEZZI MARKZTING, LLC__ hereby acknowledge that I have read and understand the above stated policy.

__ALI-NADEEM__
Print Name

__Ali__
Signature

__06-09-2016__
Date

Field Sales Channel Initials: _____

PROPRIETARY AND CONFIDENTIAL

# **EXHIBIT B**

**AMENDMENT TO**
**TELESALES CHANNEL AGREEMENT**

This Amendment ("Amendment") dated January 1, 2017 ("Effective Date") is made and entered into by and between Liberty Power Holdings LLC ("Retailer") and Mezzi Marketing ("Telesales Channel"), each a "Party" and collectively, the "Parties" to that certain Telesales Channel Agreement (the "Agreement"), dated May 5, 2016.

WHEREAS, Retailer engages in the business of supplying retail energy services and products to residential and commercial customers in various Applicable Markets;

WHEREAS, Retailer has contracted with a third party supplier for the purpose of serving retail natural gas customers ("Third-Party Supplier");

WHEREAS, Telesales Channel represents that it (i) is licensed, registered and/or certified, as may be required by law; and, (ii) possesses the requisite skill, knowledge, and experience to perform marketing and customer acquisition services by use of Sales activities ("Services");

WHEREAS, Retailer engaged Telesales Channel to provide the Services in the Applicable Markets for Electric Products and is adding natural gas as another product;

In consideration of the premises and of the mutual covenants contained herein, the Parties agree to amend their Agreement as follows:

1. Section I, DEFINITIONS, shall be deleted in its entirety and replaced as follows:

1.01 Electricity Product - Electricity Product is defined as delivered electricity sold to retail residential and commercial customers within areas open to retail competition in U.S states or jurisdictions where selection of a competitive retail electric supplier is permitted.  It is understood by both Parties that the Electricity Product consists of the electricity commodity together with services performed by the respective transmission and/or distribution utility ("Utility") and the applicable Independent System Operator ("ISO") but that Retailer does not perform Utility or ISO services and may pass through such charges to the Eligible Customer.

1.02 Eligible Customer - (a) An Eligible Customer is a separately metered residential or commercial customer, or "aggregation" of separately-metered customers, whose meter is located within an area in the Applicable Markets served by Retailer; that is not listed on any state or Federal do-not-call list; that has a bona fide interest in shopping for its electricity supply service; and, that meets Retailer's credit qualification standards. In the case of retail residential and commercial customers not located in the Applicable Market(s), such customer will be qualified by Telesales Channel to be eligible for electric service by a competitive supplier; (b) An Eligible Customer is also a residential or commercial customer, or "aggregation" customers in the Applicable Market served by Retailer, that may be equipped to receive Natural Gas Products located within an area in the Applicable Markets served by Retailer; that is not listed on any state or Federal do-not-call list; that has a bona fide interest in shopping for its gas supply service; and, that meets Retailer's credit qualification standards. In the case of retail residential and commercial customers not located in the Applicable Market(s), such customer will be qualified by Telesales Channel to be eligible for gas service by a competitive supplier.

1.03 Acquired Customer - Shall mean an Eligible Customer procured by Telesales Channel that is not currently served by Retailer, unless renewal of such Eligible Customer has otherwise been approved or accepted by Retailer, who during the Term of this Agreement (i) signs up for Electricity Product and/or Natural Gas Product from Retailer pursuant to Retailer's then-current retail sales contract; and (ii) is

accepted by Retailer pursuant to Section 2.03. Acceptance shall be indicated by the earlier of the issuance of a contract signed by Retailer or the receipt of a "Welcome Letter" by the Acquired Customer and confirmation sent to Telesales Channel.

1.04 Flow Start Date - Means the day that the Retailer begins to provide electric or gas service to the Acquired Customer as confirmed by the Utility or Retailer's Third-Party respectively.

1.05 Natural Gas Product - Natural Gas Product is defined as naturally occurring gas sold to retail and commercial customers within areas open to retail competition in U.S. states or jurisdiction where selection of a competitive retail gas supplier is permitted. It is understood by both Parties that the Natural Gas Product consists of services performed by the respective distribution utility ("Utility") and the applicable Independent System Operator ("ISO") but that Retailer does not perform Utility or ISO services and may pass through such charges to the Eligible Customer.

2. With the exception of the above changes to the Definitions section in the Agreement, the term "Electricity Product" shall be replaced with "Electricity and/or Natural Gas Product(s)" wherever utilized throughout the Agreement.

3. Sub-section 2.06 of the Agreement is hereby deleted in its entirely and replaced as follows:

2.06 Compliance with Laws - Telesales Channel represents to Retailer that it is familiar with all laws, ordinances, rules, and regulations governing Telesales solicitation of Services and expressly acknowledges that Retailer relies upon such representation.  Retailer and Telesales Channel agree to comply with all local, state, and federal laws and regulations, including the telemarketing sales rules adopted by the Federal Trade Commission in 16 C.F.R. Part 310, applicable to the transactions between and among Retailer, Telesales Channel and the Eligible Customers and Acquired Customers.

Without limitation, Telesales Channel shall:

i. if required under applicable law, be licensed or registered as a broker, or aggregator, including Telesales and telephone marketing and sales, and comply with regulatory and legal provisions of the Applicable Markets, as amended from time to time;

ii. implement any regulatory compliance measures that Retailer deems necessary and that are in accordance with industry best practices, including but not limited to mandatory compliance or other training for its agents and representatives, local and national background checks, drug testing, and such guidelines as may be provided, supplemented, and updated by Retailer from time-to-time;

iii. promptly notify Retailer and permanently remove any individual who has engaged in fraudulent or deceptive solicitation or who violates any state or federal law or regulation. Such notification shall include the nature of the violation and customers that may be impacted;

iv. obtain all necessary permits and licenses for itself and for each agent, employee or independent sales person prior to conducting Telesales solicitation on behalf of Retailer.  Telesales Channel is responsible for all related costs, including costs of posting a surety bond; provided, however, Telesales Channel may decline to sell the Services in a given Market if Telesales Channel determines that such costs are unduly burdensome and Retailer agrees; and

v. be solely liable for and shall indemnify and hold harmless Retailer in respect of any or all fines, penalties or taxes imposed by any governing authority for the failure of Telesales Channel to comply with any local, state or federal law, ordinance, rule or regulation.

vi. only conduct telephone solicitations in in the manner specified in and consistent with this Agreement.

4. Sub-section 2.08, Applicable Markets, is modified and replaced as follows:

2.08 Applicable Markets - The Telesales Channel will be authorized by Retailer to sell in the markets as specified in Schedule 1, attached hereto and made a part hereof.  Telesales Channel agrees to provide Retailer satisfactory documentation upon request that it has received the appropriate regulatory approvals to sell energy products in the Applicable Markets and will reference any suggested sales guidelines provided by Retailer. Authorization to sell in any additional Markets will be subject to the prior written approval (which may be communicated by electronic mail) of Retailer.

5. Sub-section 5.01, Indemnify, shall be deleted in its entirety and replaced as follows:

5.01 Indemnity - Telesales Channel agrees to indemnify, defend and hold the Retailer and its Third-Party Supplier harmless against all claims, damages, and liability (including reasonable attorney's fees, fines, penalties, etc.) resulting from or arising out of Telesales Channel's breach of this Agreement, non-compliance with any applicable law or regulation, other failure to perform its obligations under this Agreement, negligence, misconduct, or any material inaccuracy of any representation or warranty set forth in this Agreement. The obligations set forth in this Paragraph shall survive the expiration or any termination of this Agreement, with respect to any such claim, damage or liability, until the statute of limitations applicable to such matter has expired.

6. Sub-section 1(a) to Schedule 1 of the Agreement, is hereby amended and replaced with the following:

1(a) Daily Pricing Commission – Commission Baseline

(i) The Standard Commission Structure - For each residential Acquired Customer procured, as a direct result of Telesales Channel's efforts and based upon Retailer's Daily Pricing, Retailer agrees to pay Telesales Channel a one-time commission of seventy dollars ($70.00) for each residential customer contract having a contract term of twenty-four (24) months or greater.  Telesales Channel will not be paid a commission for Acquired Customers having a contract term of less than twenty-four (24) months, unless approved by Retailer in advance of deal submission.

(ii) The Temporary Commission Structure - Notwithstanding the foregoing, and on a temporary basis only, Retailer agrees to pay Telesales Channel a one-time commission of seventy dollars ($70.00) for each customer contract having a contract term of six (6) months or greater.

(iii) The Temporary Commission Structure shall be in effect from January 1, 2017.  Retailer reserves the right to discontinue or alternate between the Temporary Commission Structure, and the Standard Commission Structure, at any time.

7. Sub-section 2(b)IV of Schedule 1 of the Agreement is hereby amended and replaced with the following:

2(b)IV. Payment of Commissions for renewed Daily Pricing Transactions – At Retailer's sole discretion, Telesales Channel may be granted permission to renew Acquired Customer contracts.  For each Acquired or Other Customer renewed, with contract terms as outlined in sub-section 1(a), and as a direct result of Telesales Channel's efforts based on Retailer's Daily Pricing, Telesales Channel will be paid pursuant to Section 1(a) and 2(a)III of this Schedule.

8. Section 6 of Schedule 1 of the Agreement, entitled as Key Performance Indicators, is hereby amended and replaced with the following
6. Key Performance Indicators

(a) Telesales Channel must meet and maintain all Key Performance Indicators ("KPIs") outlined herein throughout the term of the Schedule. Retailer and Telesales Channel agree to conduct weekly reviews to ensure that KPIs are maintained. If it is determined by Retailer that Telesales Channel is not meeting any of these KPIs, Retailer may, in its sole discretion, exercise its right to revise or terminate this Schedule.

    (i) Telesales Channel's efforts must result in a minimum of 150 Acquired Customer contracts procured on behalf of Retailer each week.

    (ii) Telesales Channel must have at least twenty (20) full-time agents engaged on the campaign at all times.

    (iii)Telesales Channel must achieve an overall minimum average quality assurance score of eight-five percent (85%) per week.

    (iv)Telesales Channel shall achieve an overall retention rate of eighty-five percent (85%) per week.

9.  Schedule 1 of the Agreement is hereby extended through and including December 31, 2017.

10.  A new schedule for natural gas is attached hereto as Schedule 1B.

11.  Schedule 1B shall be effective from January 1, 2017 through and including December 31, 2017.

12.  Except as expressly modified herein, all other terms and conditions of the Agreement remain in full force and effect.

IN WITNESS WHEREOF, the Parties have caused this Amendment to be executed by their duly authorized representatives.

**LIBERTY POWER HOLDINGS LLC**
**(Retailer)**

Signed By: _____

Printed Name: _____

Title: _____

Date: _____

**MEZZI MARKETING**
**(Telesales Channel)**

Signed By: _Ali·Nadeem_____

Printed Name: _Ali·Nadeem_____

Title: _Director operations_____

Date: _12-27-2016_____

**SCHEDULE 1B**
**Commission Structure – Natural Gas**

This commission structure shall apply commencing on January 1, 2017 and continuing through and including December 31, 2017.

1. <u>**Daily Pricing Commission (Natural Gas)**</u> - For each residential Acquired Customer procured as a direct result of Telesales Channel's efforts, in which the natural gas contract is approved by Retailer and the contract term is twenty-four (24) months or greater, Retailer agrees to pay Telesales Channel a one-time commission of thirty-five dollars ($35.00).  Telesales Channel will not be paid a commission for any natural gas customer contracts that are not approved by Retailer after deal submission or where the customer contract term is less than twenty-four (24) months.

2. <u>**Calculation Basis and Timing of Payment**</u>

   (a) **Payment for Commissions for Daily Transactions** - For each Acquired Customer procured as a direct result of Telesales Channel's efforts, that meet the criteria in Sections 1 above, Telesales Channel will receive a one lump sum commission payment within either (i) fifteen (15) business days following the last date in Retailer's commission week or (ii) fifteen (15) business days following the date that an Acquired Customer is accepted by Retailer; whichever is later.

   (b) **Renewal and Timing of Renewed Acquired and Other Customer (aka "Residual") Payment**

      I.    Telesales Channel shall not contact Acquired Customers without express prior written authorization by Retailer;

      II.   At Retailer's discretion, Retailer may contact Acquired Customers and renew Acquired Customer's contracts independently of Telesales Channel, without any obligation to pay a renewal commission;

      III.  At Retailer's discretion, Telesales Channel may be provided with information and schedules of existing Retailer customer contracts ("Other Customers") and/or Acquired Customers for purposes of renewal with Retailer by Telesales Channel;

3. <u>**Commission Adjustments**</u>

   (a) Early Customer Termination – In the event that an Acquired Customer terminates service or otherwise breaches its contract during the thirty (30) days immediately following the Acquired Customer's Flow Start Date ("Customer Default"), Retailer shall be entitled hereunder to obtain a Refund from Sales Channel for any commissions advanced.

   (b) Commission Reimbursement - In the event that Telesales Channel owes Retailer a Refund pursuant to this Agreement, the Refund shall be paid to Retailer within the earlier of thirty (30) days from the date of such Customer Default, or as set offs by Retailer against commission payments due to Telesales Channel after Customer Default.  In the event no further commission payments are due under Schedule 1B for the Natural Gas Product, Retailer may set off such refund against commission payments due to Telesales Channel for commissions earned for sale of Electricity Products outlined in Schedule 1.  In the event no further commission payments are due to Telesales Channel under Schedule 1, then Telesales Channel will Refund amount due to Retailer within five (5) business days' notice thereof. The obligation of Telesales Channel to pay a Refund to Retailer shall survive any termination of this Agreement whether by its terms, or through any termination by Telesales Channel or Retailer, as the case may be.



(c)  Commission Payment Challenge by Telesales Channel

    I.  Telesales Channel agrees to identify any commission payment (or omission of payment) discrepancies via email within the lesser of sixty (60) calendar days after the disputed commission payment was issued, or sixty (60) calendar days after the disputed commission payment was due, and Retailer agrees to reconcile the disputed payment within thirty (30) calendar days after notification of any alleged discrepancy, so that any agreed upon adjustment based upon a Telesales Channel challenge is made within fifteen (15) calendar days of an agreed upon resolution of the claimed discrepancy.

    II.  Retailer and Telesales Channel therefore agree that Retailer has no obligation to reconcile or honor any commission dispute that is identified more than sixty (60) calendar days after the date the disputed or omitted payment was made or was due.

(d)  Termination of Commission Payments - Payment of any and all commission(s) with respect to an Acquired Customer pursuant to the Agreement shall terminate upon the earlier of:

    I.  Retailer's payment of all commission payments for lump sum billing owed to Telesales Channel and corresponding to the initial term of service of an Acquired Customer pursuant to its contract with Retailer;

    II.  The Acquired Customer's Termination of Service, subject to the provisions of this Schedule; or

    III.  Retailer's termination of this Agreement for Telesales Channel's breach of its obligations hereunder, provided, however, that in the event that Retailer terminates this Agreement, Telesales Channel shall be entitled to any commissions as they are owed for Acquired Customers that have met the criteria in Section 1, prior to the termination of this Agreement.

4.  **Applicable Markets**:  The Applicable Markets are as mutually agreed to between the Parties.



# **EXHIBIT C**



January 5, 2018                                    **Via:**    **Email and Overnight Mail**
                                                              ali.nadeem@mezzimarketing.com

Mezzi Marketing, LLC
Attention:  Ali Nadeem
14519 Cherry Lake Drive East
Jacksonville, Florida 32258

Re:    Notice of Telephone Consumer Protection Act ("TCPA") Complaint filed against Liberty
       Power Corp, LLC and Demand for Defense and Indemnification

Dear Mr. Nadeem:

William McDermet filed a civil action in the Essex County, Massachusetts, Superior Court for damages in excess of $95,000.00 against Liberty Power Corp, LLC ("Liberty Power") alleging violations of the TCPA.  A copy of Mr. McDermet's Complaint is attached.  Liberty Power was served with this Complaint on December 20, 2017 and must file an Answer by January 9, 2018.  Our internal investigation, in conjunction with assistance and information provided by Mezzi Marketing, LLC ("MEZ") has revealed that MEZ was responsible for some, if not all, of the calls placed to, received by and complained of by Mr. McDermet.

In accordance with Section 5.01 of the Telesales Channel Agreement executed by Liberty Power and MEZ, effective May 5, 2016, Liberty Power is providing formal notice of Mr. McDermet's Complaint to MEZ and demands MEZ assume sole control of the defense of same.  Further, pursuant to said Section 5.01, Liberty Power demands indemnification from MEZ for any and all costs it incurs in its defense of the McDermet Complaint.  Should MEZ either decline to assume sole control of the defense of Liberty Power in the McDermet Complaint or not respond to this letter by noon of January 9, 2018, Liberty Power intends to remove said Complaint to Federal Court by the close of business on January 9, 2018.  Additionally, in its Answer to the McDermet Complaint, Liberty Power may include a third-party complaint against MEZ.

If you have any questions, please call me at (954) 267-5422.  Thank you.

Sincerely,

Garson Knapp
Associate General Counsel

Enclosure(s):   As Stated

*Powerful Together*

Liberty Power is a registered trademark of Liberty Power Corp. LLC. Liberty Power Corp. – encompassing Liberty Power Holdings LLC, Liberty Power Maryland LLC, Liberty Power District of Columbia LLC, and LPT LLC dba LPT SP LLC – is certified and licensed by the Public Utilities/Service Commissions of: CA, CT, DC, DE, IL, ME, MD (IR793), MA (CS-057) MI, NJ (ESL-0001), NY, OH, PA, RI, TX (10118) and VA; and is licensed and certified by the Federal Energy Regulatory Commission.